Filed 12/11/20  Cardamon v. Dominion Courtyard Villas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TERESE CARDAMON et al., | F076760 |
| Plaintiffs and Appellants, | (Super. Ct. No. 16CECG01918) |
| v. | |
| DOMINION COURTYARD VILLAS et al., | **OPINION** |
| Defendants and Respondents. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

Gilmore, Magness Janisse and Tyler H. Lester; Law Offices of Mark Schallert and Mark Schallert; Law Offices of David Douglas Doyle and David Douglas Doyle for Plaintiffs and Appellants.

Sagaser, Watkins & Wieland, Howard Alan Sagaser, Ian B. Wieland, and Allie E. Wieland for Defendants and Respondents.

-ooOoo-

Plaintiffs Terese and Nicholas Cardamon appeal from the Fresno County Superior Court's October 13, 2017 order denying their motion for class certification. For the reasons set forth below, we reverse the order.

## FACTUAL AND PROCEDURAL HISTORY

Between March 27, 2015, and March 25, 2016, plaintiffs rented an apartment at Dominion Courtyard Villas (Dominion), one of nine residential complexes in or around Fresno County operated and/or managed by defendants.[1] Thereafter, defendants assessed various charges against plaintiffs' security deposit "to restore [the] apartment unit" (boldface & capitalization omitted), such as $104.30 for "[c]leaning [m]aterial and [l]abor," $174.52 for "[p]ainting [l]abor and [m]aterial," and $1,782.80 for "[p]ad & [c]arpet [r]eplacement [p]et [d]amage," inter alia. The costs were detailed in a "Resident Request Form" (boldface & some capitalization omitted), a standardized three-page document. Each charge included a 40 percent administrative fee.

In the operative complaint filed on July 28, 2016, plaintiffs alleged defendants violated Business and Professions Code section 17200 et seq. and Civil Code section 1950.5 by imposing the 40 percent administrative fee. They sought to represent themselves "and all other individuals who have rented, or were renting, apartment units managed or owned by defendants, in which defendants applied [said] fee on costs being deducted from security deposits when these individuals vacated the units . . . , at any time during the four years preceding the filing of this action, and continuing while this action is pending . . . ."

On May 15, 2017, plaintiffs filed a motion for class certification. The class was defined as " '[a]ll tenants who rented residential units through and/or from defendants

---

**1** Defendants are Dominion; Scott Ellis Enterprises, LLC; Scott Ellis Enterprises, L.P.; Barcelona Apartments; Casa Del Rio Apartments; Dartmouth Tower Apartments; Oxford Park Apartments; Reef Apartments; Scottsmen Apartments; Scottsmen Too Apartments; Villa Faria Apartments; Cedar Shepherd, L.P.; and Scott C. Ellis, LLC.

2.

from June 15, 2012, through the effective date determined by the [superior] [c]ourt, from wh[om] a 40[ percent] "administrative fee" or "markup" was charged on costs deducted from the security deposit . . . .' " Plaintiffs asserted the class was ascertainable via defendants' internal records, e.g., the Resident Request Form, and "clearly large enough to warrant class action treatment" in view of certain deposition testimony. They also asserted "the princip[al] questions of law and of fact are common to class members" given "the uniformity of [defendants'] practices" and "[defendants'] use of standardized documents" "showing the deductions from tenants['] security deposits for 'administrative fees' "; their claims were "typical of those of [the] [c]lass" because they "had [the] 40[ percent] administrative fee assessed against costs deducted from their security deposits"; and their attorney was "qualified to conduct class litigation."

In support of their motion, plaintiffs provided the October 26, 2016 deposition testimony of Scott Ellis, Jr., the general manager of Scott Ellis Enterprises, LLC. The transcript read in part:

"Q. . . . [T]o your knowledge, has this 40 percent administrative fee been charged for all the complexes . . . for at least the last five years?

"A. Yes.

"Q. And has there been any change in the policy of charging a 40 percent fee since this lawsuit was filed?

"A. No.

"Q. So to your knowledge, that practice continues up until today?

"A. Yes. [¶] . . . [¶]

"Q. . . . . Is it a common situation that when a tenant moves out that part of the repair and cleanup of a unit is some type of painting?

"A. On a majority of move-outs, I would say so, yes. [¶] . . . [¶]

"Q. And I believe you said that [Dominion] has 280 units?

"A.    287.

"Q.    287. [¶] . . . [¶]  It appears that the number of move-outs does not vary much from year to year.  There is 150 in 2012, 164 in 2013, 165 in 2014, and 159 in 2015.  Is that typical of what you would expect, about a 50 percent turnover rate a year?

"A.    That's typical.  We like it when it's less than that . . . . [¶] . . . [¶]

"Q.    We are showing you [the Resident Request Form]. . . . Would the third page . . . normally be [given to residents]? . . . [¶] . . . [¶]

"A. [The third page] is . . . what we keep in-house . . . .  The residents just get . . . the first two pages.  [¶] . . . [¶]

"Q.    Now, you indicated that the resident as a general rule doesn't get [the third page] because that's maintained internally, correct?

"A.    Correct."

In their opposition to plaintiffs' class certification motion filed on May 31, 2017, defendants insisted the class definition was "vague and ambiguous," pointing out "various tenants were completely unaffected by [their] policy as their security deposits were fully returned."  (Fn. omitted.)  They further argued plaintiffs "failed to prove the existence of a uniform policy or practice that resulted in a violation of the law."  (Boldface, underscoring & some capitalization omitted.)  Defendants noted:  (1) "each apartment complex has unique and diverse practices including, but not limited to:  the cost to rent an apartment, the amount of security deposit required from each tenant at the beginning of the lease period, whether a tenant will be refunded his or her full security deposit at the time of move[-]out, how much of the security deposit the tenant will be refunded, why the tenant is/is not being refunded, what repairs were necessary, and whether the repairs were completed in-house or by a third party"; and (2) "[p]laintiffs have not submitted declarations from any members of the [p]roposed [c]lass – such as their neighbors in Dominion or any other tenants who leased apartments in Dominion or any of the other complexes – to support their position that all tenants of the [p]roposed [c]lass

suffered damages as a result of [the challenged] policy." Furthermore, according to defendants, plaintiffs' failure to provide these declarations demonstrated their claims were "not typical of the class."

In support of their opposition, defendants submitted several declarations. In one declaration, Ellis stated:

> "3. Scott Ellis Enterprises, LLC is a property management company . . . that manages eight of the apartment complexes in this lawsuit . . . . [¶] . . . [¶]

> "5. Cedar Shepherd [Limited Partnership] only manages . . . Dominion . . . . [¶] . . . [¶]

> "9. The 40[ percent] fee at issue in this case was not designed by [d]efendants so that the entities would make a profit. It helps cover our out[-]of[-]pocket costs incurred with the cleaning and repair of a vacated apartment."

In a separate declaration, Kathy Lynn, Scott Ellis Enterprises, LLC's office manager, stated:

> "3. The nine complexes vary with respect to size and the manner in which their general operations are conducted. For instance, Dominion is substantially larger than any other complex (it has 287 units, which is more than 100 units more than the second largest complex) and is structured very differently when compared to the other complexes. Dominion is managed by a team of two that act as managers, [three] assistant managers, [one] maintenance supervisor, five maintenance employees, [five] leasing agents, an activities director, and two cleaners.

> "4. Dominion is the only complex of the nine that employs a maintenance supervisor. Thus, whereas Dominion has its own in-house employees who perform the work when an entire unit is painted, some of the smaller complexes don't employ any maintenance workers.

> "5. Scottsmen Too [Apartments] has 182 units, 10 staff members, is managed by a team of two that act as managers, an assistant manager by another team of two, employs [two] leasing agents, [three] maintenance workers and one employee whose job is to clean the laundry room and recreational area full-time.

"6.     Scottsmen [Apartments] has 126 units, one team that manages the complex and another team that assistant manages. It has [two] leasing agents, and [three] maintenance workers.

"7.     Barcelona [Apartments] only has 38 units and is managed by a team of two. These are the only two employees . . . . Because Barcelona [Apartments] is not large enough to warrant employment of its own maintenance worker, the management team of one couple completes as much repair work as feasible. The remaining repair work related to move[-]outs and repairing units is outsourced to various third[-]party vendors. Such is the case at each complex that does not employ any maintenance workers.

"8.     Casa Del Rio [Apartments] only has 24 units and is managed by one part-time manager.

"9.     Dartmouth [Tower Apartments] has 82 units and is managed by a team of two. It also employs a team of two assistant managers. It does not employ any maintenance workers.

"10.     Oxford [Park Apartments] has 52 units and employs one manager and one maintenance worker.

"11.     Reef [Apartments] has 58 units and is managed by a team of two. It does not employ any maintenance workers.

"12.     Villa Faria [Apartments] has 65 units and is managed by a team of two. It does not employ any maintenance workers. It has one part-time leasing agent who works approximately two days per week. [¶] . . . [¶]

"14.     Each complex has a different individual who oversees the move-out process. For instance, the complex assistant manager meets with the tenant to perform a walk[-]through inspection of the unit. Information is then provided to the manager, who informs the maintenance workers (or outside vendors) of the materials that need to be purchased/used to complete the necessary repairs. The manager compiles the costs and prepares a refund request, which is then sent to an area supervisor for review and approval.

"15.     During the relevant time period of [p]laintiffs' [c]omplaint, there were five area supervisors in charge of the nine complexes. One area supervisor oversaw Dominion; one oversaw Barcelona [Apartments] and Scottsmen [Apartments]; one oversaw Oxford [Park Apartments] and Villa Faria [Apartments]; one oversaw Casa Del Rio [Apartments] and

6.

Scottsmen Too [Apartments]; and the fifth area supervisor oversaw Dartmouth [Tower Apartments] and Reef [Apartments].

"16.    Whether and how much of a tenant's security deposit will be refunded is determined by the manager at each complex based on the time, material and costs and reviewed/approved by the area supervisor.

"17.    Each complex has a different person in charge of handling move[-]outs and security deposits, a different maintenance staff that performs the necessary repairs to each unit after a tenant moves out, [and] different volumes of in-house maintenance versus maintenance that must be outsourced, among other things."

In another declaration, Don Ernst, Cedar Shepherd Limited Partnership's accounting/human resources manager, stated:

"3.    In 2012, Dominion incurred $215,158.16 to restore its units after tenants moved out.  Dominion only withheld and applied $68,142.08 from tenants' security deposits.  Thus, without the 40[ percent] markup, Dominion would have been in the negative $147,016.08 restoring units. Even with the 40[ percent] markup (.40 x $68,142.08 = $27,256.83), Dominion lost $119,759.25.

"4.    In 2013, Dominion incurred $237,645.96 to restore its units. However, Dominion only withheld and applied $121,327.63 from tenants' security deposits.  Thus, without the 40[ percent] markup, Dominion would have been in the negative $116,318.33 restoring units.  Even with the 40[ percent] markup (.40 x $121,327.63 = $48,531.05), Dominion lost $67,787.28.

"5.    In 2014, Dominion incurred $284,992.83 to restore its units. However, Dominion only withheld and applied $119,093.19 from tenants' security deposits.  Thus, without the 40[ percent] markup, Dominion would have been in the negative $165,899.64 restoring units.  Even with the 40[ percent] markup (.40 x $119,093.19 = $47,637.27), Dominion lost $118,262.37.

"6.    In 2015, Dominion incurred $283,828.49 to restore its units. However, Dominion only withheld and applied $95,241.68 from tenants' security deposits.  Thus, without the 40[ percent] markup, Dominion would have been in the negative $188,586.81 restoring units.  Even with the 40[ percent] markup (.40 x $95,241.68= $38,096.67), Dominion lost $150,490.14.

"7.     Only fees pertaining to the maintenance and repair of the units include the 40[ percent] fee.  The fee is included to help cover the cost of supplies, scheduling, contacting third[-]party vendors, coordinating and performing the labor related to the repairs to a unit, as well as time spent overseeing the work of third[-]party vendors and other overhead costs associated with cleaning and repair of the vacated unit such as the percentage of employee benefits and wage burden attributed to the repair or cleaning of the unit."

In a tentative ruling issued on September 26, 2017, the superior court indicated it would deny plaintiffs' class certification motion.  The ruling read:

> "*I.     Ascertainable Class*
>
> "Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata. [Citation.]  'Whether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying class members.'  [Citation.][2]
>
> "*A.     Class Definition*
>
> "Ascertainability can best be achieved 'by defining the class in terms of objective characteristics and common transactional facts,' rather than defining it in such a way that proposed class members must establish the merits of their case in order to be considered part of the class.  [Citation.] Class certification can be denied for an unascertainable class when the proposed definition is overbroad and the plaintiff offers no means by which only those class members who have claims can be identified from those who should not be included in the class.  [Citation.]
>
> "Here, plaintiffs['] . . . class definition is as follows:  [¶] . . . [¶]  All tenants who rented residential units through and/or from defendants from June 15, 2012, through the effective date determined by the [c]ourt, from

---

**2**     In *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955 (*Noel*), our Supreme Court identified this three-factor approach as one of two ascertainability tests utilized by state appellate courts since 1967.  (*Id.* at p. 974.)  The high court held "that the objectives of [the ascertainability] requirement are best achieved by regarding a class as ascertainable when it is defined 'in terms of objective characteristics and common transactional facts' that make 'the ultimate identification of class members possible when that identification becomes necessary' " (*id.* at p. 980) and "disapprove[d] of" the three-factor approach to the extent it "could be read to demand a more exacting inquiry" (*id.* at p. 986, fn. 15).

wh[om] a 40[ percent] 'administrative fee' or 'markup' was charged on costs deducted from the security deposit.

"[Defendants] contend[] that the class is ambiguous because various tenants were unaffected by the policy as their security deposits were fully returned.  [¶]  However, any tenants not charged the 40[ percent] administrative fee by definition would not be in the class.  Plaintiffs are clearly contesting the 40[ percent] fee[] as to all items for which the fee was applied.  [Citation.]  The definition is certain.

"*B.    Size of the Class*

"The party seeking class certification must prove approximate size of proposed class.  (*Bauman v. Islay Investments* (1975) 45 Cal.App.3d 797, 801 (*Bauman*).)

"Plaintiffs only provide very limited information about the size of the class.  They point out that defendants charged the administrative fee for nine complexes for at least the last five years, and this practice is still . . . utilized today.  From 2012 to 2015, 638 tenants moved out of one of the complexes named in this action.  [Citation.]  But plaintiffs provide no information as to how many of those were charged the administrative fee.  Plaintiffs merely leave the court to guess at the size of the class.

"*C.    Identifying Class Members*

"To determine the identity of potential class members, the court will look to whether there are any objective criteria to describe them and whether they can be found without unreasonable expense or effort through business or official records.  [Citation.][3]

"As plaintiffs point out, putative class members can be easily identified through defendants' records.  Little more would be required than the three[-]page security deposit forms, which will reveal whether the

---

**3**    In *Noel*, *supra*, 7 Cal.5th 955, the Supreme Court acknowledged some appellate courts employing the three-factor approach "have . . . *required* a class plaintiff to make a specific factual or evidentiary showing in order to show an ascertainable class" (*id.* at p. 975, italics added), namely, to "demonstrate that individual members of the proposed class can 'be readily identified without unreasonable expense or time' " (*ibid.*) " ' " 'by reference to official records' " ' " (*id.* at p. 966; accord, *id.* at pp. 974, 986, fn. 15).  The high court emphasized "this is one way but not the only way to show an ascertainable class" (*id.* at p. 986, fn. 15) and "disapprove[d] of this standard insofar as it could be perceived as exclusive" (*ibid.*).

administrative charge was withheld from a tenant's security deposit. Defendants do not argue that [this] is an issue.

"*II.      Community of Interest*

"*A.      Predomina[nt] Common Questions of Law or Fact*

"The plaintiffs' 'burden of moving for class certification . . . is not merely to show that some common issues exist, but, rather, to place substantial evidence in the record that common issues predominate.' [Citation.]  And whether such substantial evidence exists involves analysis of whether the proponent's 'theory of recovery' is likely to prove compatible with class treatment.  [Citation.]  'A trial court ruling on a certification motion determines "whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants." ' [Citation.]  'It is well established that the necessity for an individual determination of damages does not weigh against class certification.  The community of interest requirement recognizes that "ultimately each class member will be required in some manner to establish his individual damages . . . ." ' [Citation.]  [¶] . . . [¶]

" '[E]vidence of a uniform policy or practice, not just an allegation, is necessary in order to certify the class.' [Citation.]  [The California Supreme Court] held that where there was common proof of a company policy or practice, a class action could proceed.  It did not matter whether that policy was legal or unlawful.  [Citations.]

". . . Ellis testified at his deposition that the 40[ percent] administrative fee has been charged for all the complexes for at least the past five years, and the practice continues today.  [Citation.]  Ellis states in his declaration in opposition to the motion for class certification that at the termination of the tenancy, defendants deduct from the security deposit actual costs associated with repairing damage caused by the tenant and to clean the premises.  [Citation.]  'Each of these costs include [the] 40[ percent] fee . . .' [Citation.][4]

---

**4**      The superior court actually cited Ellis's declaration in support of defendants' summary judgment motion, which was filed on the same day as his declaration in opposition to plaintiffs' class certification motion.  The court ultimately denied the summary judgment motion.

10.

"With Ellis'[s] admissions, plaintiffs present evidence of a uniform policy or practice applicable to all persons in the proposed class. Based on the uniformity of defendants' practices and use of standardized documents, such as the three[-]page [Resident Request F]orm and/or other records showing the deductions from tenants' security deposits for administrative fees, the princip[al] questions of law and of fact are common to class members, and clearly predominate over any individual questions.

"However, defendants correctly point out that plaintiffs have not submitted declarations from any members of the proposed class – such as their neighbors in Dominion or any other tenants who leased apartments in Dominion or any of the other complexes – to support their position that others suffered damages as a result of defendants' policy.

"In *Bauman*, *supra*, 45 Cal.App.3d 797, a purported class action to recover security deposits retained by a landlord, the plaintiff sought to represent past and present tenants of 22 apartment buildings owned by defendants who entered into written agreements with defendants and paid non-refundable cleaning fees. Plaintiff alleged that defendants refused to refund portions of the cleaning fees not used to clean the apartments of tenants who terminated their tenancies.

"Certification was properly denied where . . . [¶] [plaintiff] offered no proof that anyone other than herself had rented a furnished apartment from Islay, signed the identical rental agreement, paid a cleaning deposit, moved out, and failed to receive a proper refund. She made no showing that anyone other than herself was dissatisfied with the cleaning arrangements for the vacation of a furnished apartment. . . . [N]or did she offer proof that anyone except herself and her counsel desired to prosecute the lawsuit or stood to profit from it. Without proof of the existence and composition of the class, the court could neither determine its jurisdiction over unidentified class members, nor the notice it would be proper to give them. (*Bauman*, *supra*, 45 Cal.App.3d at p. 801.)

"The plaintiff failed to show that other members of the class wanted to join her class action, or what the claims of others might be. The appellate court noted[:] [¶] [']While it might have been possible for the trial court to assume with [plaintiff] that other tenants paid similar cleaning fees and moved out with refunds owing to them, assumptions, inferences, and speculations are no substitute for evidence. We think the trial court correctly required [plaintiff] to prove that her action qualified as a class action, and when she failed to do this at a hearing held for that express purpose the court properly dismissed her suit.' (*Bauman*, *supra*, 45 Cal.App.3d at pp. 802-803.)

"Like in *Bauman*, plaintiffs put forth no direct evidence of another tenant charged the administrative fee. That there were others would be a very easy inference to make, but an inference nonetheless. . . .

"Due to plaintiffs' failure to submit evidence of typicality, as well as the size of the class, the motion must be denied. Plaintiffs have not met their burden.

"Defendants continue by pointing out that each apartment complex has unique and diverse practices including, but not limited to: the cost to rent an apartment, the period, [w]hether a tenant will be refunded his or her full security deposit at the time of move[-]out, how much of the security deposit the tenant will be refunded, why the tenant is/is not being refunded, [w]hat repairs were necessary, and [w]hether the repairs were completed in-house or by a third party. Also, each complex has a different person in charge of handling move[-]outs and security deposits, a different maintenance staff that performs the necessary repairs to each unit after a tenant moves out, different volumes of in-house maintenance versus maintenance that must be outsourced, among other things. [Citation.] Thus, defendants contend, whether a tenant is entitled to a potential recovery here is dependent on facts peculiar to his or her case and a class action of [p]laintiffs' claims is not manageable.

"However, these facts are not relevant to any individual class member's recovery. All that would need to be determined in this action is whether the administrative fee violates Civil Code section 1950.5 (liability), and with respect to each class member, whether the fee was withheld from their security deposit, and how much. '[T]he necessity for class members to prove their own damages does not mean individual fact questions predominate.' [Citation.] There is a very minimal degree of individual proof needed in this case – the amount of the administrative fee withheld.

> "i.     *Representatives with Claims and Defenses Typical of the Class*

". . . '[I]t has never been the law in California that the class representative must have identical interests with the class members . . . [.] The focus of the typicality requirement entails inquiry as to whether the plaintiff's individual circumstances are markedly different or whether the legal theory upon which the claims are based differ from that upon which the claims of the other class members will be based.' [Citation.]

12.

"As discussed above, plaintiffs fail to present direct evidence of similar damages suffered by other tenants.

"*ii.    Representatives who Adequately Represent the Class*

"The class representative must be able to represent the class adequately.  [Citation.] . . .

"Based on the information presented, and lack of any opposition on this consideration, the court has no concerns about the adequacy of the representation either by plaintiffs or class counsel."[5]

Following a September 28, 2017 hearing, the court adopted its tentative ruling as its final order on October 13, 2017.

# DISCUSSION

## I.    Standard of review

"In reviewing a class certification order, our inquiry is 'narrowly circumscribed.' [Citation.]  ' "The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion:  'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.'  [Citation.]  A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions." '  [Citation.] 'Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal " 'even though there may be substantial evidence to support the court's order.' " '  [Citations.]"  (*Noel*, *supra*, 7 Cal.5th at pp. 967-968.)

"Despite this grant of discretion, appellate review of orders denying class certification differs from ordinary appellate review.  Under ordinary appellate review, we

---

[5]    We formatted the citations in the quoted text to conform to the general rules of citation outlined by the California Style Manual.  (See generally Cal. Style Manual (4th ed. 2000).)  No substantive changes were made.

13.

do not address the trial court's reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review these reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling. [Citations.]" (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939.) "[I]f they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530.)

## II.     Analysis

"Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021, quoting Code Civ. Proc., § 382.) "Drawing on the language of Code of Civil Procedure section 382 and federal precedent, [the California Supreme Court] ha[s] articulated clear requirements for the certification of a class. The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citation.]" (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1021.) State and federal requirements for class certification are analogous. (See Fed. Rules Civ. Proc., rule 23(a), 28 U.S.C.; *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 318.) Moreover, in the absence of relevant state precedents, California courts examine federal law for guidance on issues of class action procedure. (*In re Tobacco II Cases*, *supra*, at p. 318;

14.

*Green v. Obledo* (1981) 29 Cal.3d 126, 145-146; *Hendershot v. Ready to Roll Transportation, Inc.* (2014) 228 Cal.App.4th 1213, 1222, fn. 5 (*Hendershot*).)

In the instant case, the superior court denied plaintiffs' class certification motion on the grounds they failed to establish (1) size of the class; and (2) typicality. For the reasons set forth below, we reject the court's rationale.

a. *Numerosity*

"To be certified, a class must be 'numerous' in size that 'it is impracticable to bring them all before the court . . . .' " (*Hendershot*, *supra*, 228 Cal.App.4th at p. 1222, quoting Code Civ. Proc., § 382; see Fed. Rules Civ. Proc., rule 23(a)(1), 28 U.S.C. [federal statute similarly requires class "[to be] so numerous that joinder of all members is impracticable"].) "[T]here is no set number required as a matter of law for the maintenance of a class action." (*Hebbard v. Colgrove* (1972) 28 Cal.App.3d 1017, 1030; accord, *Hendershot*, *supra*, at p. 1222; see *Campbell v. Pricewaterhousecoopers* (E.D.Cal. 2008) 253 F.R.D. 586, 594 ["While there is no set number of members required [under federal law], courts have generally found classes numbering in the hundreds to be sufficient to satisfy the numerosity requirement."]; *Californians for Disability Rights, Inc. v. California Department of Transportation* (N.D.Cal. 2008) 249 F.R.D. 334, 347 ["[Federal] precedent suggests that 20-40 class members is the 'grey area' for numerosity . . . ."]; *Perez-Funez v. District Director, Immigration & Naturalization Service* (C.D.Cal. 1984) 611 F.Supp. 990, 995 ["Classes consisting of 25 members have been held large enough to justify certification."].) " 'The ultimate issue in evaluating this factor is whether the class is too large to make joinder practicable . . . .' " (*Hendershot*, *supra*, at p. 1222, fn. omitted, quoting *Celano v. Marriott Internat., Inc.* (N.D.Cal. 2007) 242 F.R.D. 544, 549.) " ' "[I]mpracticability" does not mean "impossibility," but only the difficulty or inconvenience of joining all members of the class.' [Citation.]" (*Hendershot*, *supra*, at p. 1222, quoting *Harris v. Palm Springs Alpine Estates, Inc.* (9th Cir. 1964) 329 F.2d 909, 913-914.)

Federal cases make clear the numerosity requirement is satisfied even if the exact size of the class is unknown so long as general knowledge and common sense indicate this class is large.  (See, e.g., *Gomez v. J. Jacobo Farm Labor Contractor, Inc.* (E.D.Cal. 2019) 334 F.R.D. 234, 251; *Sullivan v. Kelly Services, Inc.* (N.D.Cal. 2010) 268 F.R.D. 356, 362; *Doe v. Los Angeles Unified School Dist.* (C.D.Cal 1999) 48 F.Supp.2d 1233, 1239; *Perez-Funez v. District Director, Immigration & Naturalization Service*, *supra*, 611 F.Supp. at p. 995; *Orantes-Hernandez v. Smith* (C.D.Cal. 1982) 541 F.Supp. 351, 371, disapproved on other grounds by *Jean v. Nelson* (11th Cir. 1984) 727 F.2d 957.)  On the other hand, "mere speculation of the number of class members involved does not satisfy the requirement . . . ."  (*In re LDK Solar Securities Litigation* (N.D.Cal. 2009) 255 F.R.D. 519, 525.)

Here, the record shows defendants have imposed the 40 percent administrative fee at Dominion and the eight other residential complexes since at least 2011.  Between 2012 and 2015, 638 tenants moved out of Dominion and $403,804.58 was deducted from their security deposits.  That amount included administrative fees adding up to $161,521.82, or approximately $250 per outgoing tenant.  No figures were given for the other eight complexes, but the record shows these complexes contain a total of 627 units versus Dominion's 287 units.  According to Ellis, a "50 percent turnover rate a year" is "typical" and painting occurs for the "majority of move-outs."

In its ruling, the superior court lamented that it had to "guess at the size of the class."  "The fact that the number of persons in the class cannot be exactly determined does not preclude class certification, [citation]; a court may draw a reasonable inference of class size from the facts before it.  [Citation.]"  (*Lynch v. Rank* (N.D.Cal. 1984) 604 F.Supp. 30, 36; see Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action."].)  Based on the information provided by defendants, putative class members who vacated a Dominion apartment between 2012 and 2015

alone would number in the hundreds. This sum can only increase when the move-outs at the other complexes over the relevant period are taken into account. General knowledge and common sense indicate the class is too large to make joinder practicable. Hence, " '[t]he prerequisite of numerosity is discharged . . . .'" (*Sullivan v. Kelly Services, Inc.*, *supra*, 268 F.R.D. at p. 362.) The court's conclusion to the contrary rested on improper criteria and/or erroneous legal assumptions.[6]

b. *Typicality*

As the superior court recognized in its ruling, "typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.' [Citation.]" (*Eisenberg v. Gagnon* (3d Cir. 1985) 766 F.2d 770, 786.)[7] The requirement "serve[s] as [a] guidepost[] for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." (*Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. 338, 349, fn. 5.) " 'The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." [Citation.]' " (*Seastrom v. Neways,*

---

[6]   We point out the court emphasized "*plaintiffs* provide[d] no information as to how many of those [former Dominion tenants] were charged the administrative fee" (italics added) but also stated "putative class members can be easily identified through defendants' records" and "[l]ittle more would be required than the three[-]page [Resident Request Form], which will reveal whether the administrative charge was withheld from a tenant's security deposit." "Plaintiff's lack of knowledge as to the exact number of affected persons is not a bar to maintaining a class action, when defendants have the means to identify those persons at will." (*Ventura v. New York City Health & Hospitals Corp.* (S.D.N.Y. 1989) 125 F.R.D. 595, 599.)

[7]   In its ruling, the court quoted *Classen v. Weller* (1983) 145 Cal.App.3d 27, 46. However, that case does not contain this passage.

17.

*Inc.* (2007) 149 Cal.App.4th 1496, 1502, quoting *Hanon v. Dataproducts Corp.* (9th Cir. 1992) 976 F.2d 497, 508.) "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." (*Hanlon v. Chrysler Corp.* (9th Cir. 1998) 150 F.3d 1011, 1020.)

In *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, the plaintiff filed a consumer class action complaint against defendants, alleging they falsely advertised that a particular brand of orange juice was "fresh." (*Id.* at pp. 651-652.) The superior court denied the plaintiff's class certification motion on the grounds of typicality, inter alia. (*Id.* at p. 653.) The appellate court affirmed the order. (*Id.* at p. 671.) It explained:

> "Substantial evidence supports the court's finding [the plaintiff] did not believe the . . . orange juice he bought was 'fresh.' According to [the plaintiff]'s complaint, the class members were buyers of [the] orange juice who were deceived by the product's labeling and advertising into believing they were buying 'fresh' orange juice. In seeking class certification, [the plaintiff] defined 'fresh' orange juice as 'simply the juice squeezed from oranges; it is not altered, heated or frozen.' However, at deposition [the plaintiff] testified that when buying [the] orange juice he did not expect 'the orange juice that a store squeezes and puts into its own container and sells as fresh squeezed orange juice.' Instead, [the plaintiff] thought it was 'premium' orange juice. [The plaintiff] defined 'premium' orange juice as involving characteristics of pasteurized orange juice and fresh orange juice. [The plaintiff] understood pasteurization as 'the process of heating something to get rid of bacteria.' Thus, [the plaintiff]'s definition of 'premium' juice to include juice heated during pasteurization was broader than his definition of 'fresh' juice which excluded juice that was heated. Although [the plaintiff] alleged the class was deceived into believing defendants' product was 'fresh,' the evidence indicated he himself believed the juice was simply 'premium.' Because [the plaintiff] did not claim to be misled in the manner the class was allegedly deceived, the court could not 'decide the issue of the rights of such individuals that might possibly exist.' [Citation.] In sum, on this record the superior court reasonably concluded [the plaintiff]'s claims involving 'premium' juice were not typical of the class claims involving 'fresh' juice." (*Caro v. Procter & Gamble Co.*, *supra*, 18 Cal.App.4th at pp. 664-665, fns. omitted.)

Here, the class was defined as " '[a]ll tenants who rented residential units through and/or from defendants' " " 'from wh[om] a 40[ percent] "administrative fee" or "markup" was charged on costs deducted from the security deposit . . . .' " The record shows plaintiffs were former Dominion tenants; various charges were assessed against their security deposit; and said charges included the 40 percent administrative fee. In its ruling, the superior court focused on the lack of declarations from putative class members regarding similar damages. However, the record demonstrated the administrative fee was not imposed on plaintiffs alone: Ellis's deposition testimony and defendants' declarations revealed this was a uniform policy or practice applied to all putative class members. The court's apparent belief that only declarations from putative class members could satisfy the typicality requirement rested on improper criteria and/or erroneous legal assumptions.

c. Bauman

The superior court's ruling relied heavily on *Bauman v. Islay Investments* (1975) 45 Cal.App.3d 797 (*Bauman*). In that case, the plaintiff had rented an apartment from the defendants and paid a $40 cleaning deposit pursuant to the lease agreement. (*Id.* at p. 800.) After she terminated her tenancy in less than a month, she did not receive a refund of that deposit. (*Ibid.*) Thereafter, the plaintiff filed a class action lawsuit, in which she sought to represent past and present tenants of 22 apartment buildings owned by the defendants who "entered written agreements with [the defendants] and paid 'nonrefundable cleaning [fees].' " (*Id.* at p. 799.) Plaintiff alleged the defendants violated Civil Code section 1950.5 by "refus[ing] to refund those portions of the cleaning fees not used to clean the apartments of tenants who terminated their tenancies . . . ." (*Bauman*, *supra*, 45 Cal.App.3d at p. 799.)

The superior court ordered a hearing on class issues, including "the constitution, approximate numbers, and geographic location of the class," "the existence of common questions of law and fact affecting class members," "membership of [the] plaintiff in the

19.

class," and "[the] plaintiff's ability to properly represent the class." (*Bauman*, *supra*, 45 Cal.App.3d at p. 800.)  At said hearing, the plaintiff "rested her entire case on the declarations of herself and her attorney." (*Ibid*.)  In particular, the plaintiff's counsel asserted the defendants' buildings contained 1,471 units and estimated the class was comprised of 2,900 members. (*Ibid*.)  That approximation was based on "assumptions that all 1,471 apartment units had tenants, each unit had two different tenants during the period covered by the action, each tenant paid a cleaning deposit, and each tenant signed the same rental agreement as [the plaintiff]." (*Id.* at pp. 800-801.)  The defendants "denied these assumptions in its answer" and the plaintiff "produced no competent evidence to support any of these assumptions." (*Id.* at p. 801.)  In addition, the defendants presented declarations "assert[ing] that liability . . . would be an issue with each member of the class, that some members waived their rights under Civil Code section 1950.5, that others were estopped to assert those rights, that [the defendants] had offsetting claims for unpaid rent against other members of the class, that each terminated tenancy presented a different factual problem." (*Id.* at p. 802.)  The court concluded the plaintiff "had failed to establish the propriety of her action as a class action and dismissed her suit." (*Id.* at p. 801.)

The appellate court affirmed the judgment. (*Bauman*, *supra*, 45 Cal.App.3d at p. 803.)  It pointed out:

> "[The plaintiff] did not prove the existence, membership, and approximate size of her class, a prerequisite to a finding of the impracticality of bringing all members of the class before the court. [Citation.]  She offered no proof that anyone other than herself had rented a furnished apartment from [the defendants], signed the identical rental agreement, paid a cleaning deposit, moved out, and failed to receive a proper refund. . . .  At one point, [the plaintiff] told the trial court that 'the exact number of class members is within the knowledge of [d]efendants and can be readily ascertained by their review of their own books and records.'  Yet despite ample opportunity for discovery on class issues, she

failed to produce that 'readily ascertainable' information for the court.[8] [¶] . . . [¶]

> "[The] plaintiff . . . failed to prove that her claim was typical of others in the class or that the issues in her case were similar to those in other cases. . . . [The defendants] asserted that each member's right to recover was dependent on facts peculiar to his case, a state of affairs contraindicative of class action. [Citations.] [The defendants'] assertions went uncontroverted. [The plaintiff] interviewed no prospective members of the class, deposed no witnesses, made no requests for admissions, presented no interrogatories, conducted no discovery, called no witnesses to testify, and examined no records. . . ." (*Bauman*, *supra*, 45 Cal.App.3d at pp. 801-802.)[9]

Here, by contrast, the record contains competent evidence supporting findings of numerosity and typicality, e.g., Ellis's deposition testimony and defendants' declarations. Also, unlike the defendants in *Bauman*, defendants in the instant case asserted that damages would be an issue with each member of the proposed class, which—as the court correctly maintained in its ruling—did not weigh against class certification. *Bauman* is inapposite.

---

[8] In the instant case, on May 1, 2017, plaintiffs served defendants a "REQUEST FOR PRETRIAL DISCOVERY CONFERENCE" (boldface omitted) seeking "documents relating to the security deposits of the potential class members . . . ." In an opposition filed on May 3, 2017, defendants claimed the request was "premature" "as no class has been certified yet" and "[i]t is essential to see whether the class can be certified or not before [p]laintiffs are allowed to invade privacy rights of third parties and before the parties engage in costly and time consuming discovery on the merits." In a May 12, 2017 order, the superior court indicated it "is inclined to agree with defendant[s] that the parties should utilize a *Belaire-West* procedure to obtain the consent of the potential class members to have their personal information disclosed." (Some capitalization omitted, italics added; see *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554, 561-562 [opt-out notice in class action alleging wage and hour violation was sufficient to protect privacy rights of the defendant's former and current employees who were potential class members].) Plaintiffs apparently forewent this notice process and moved for class certification.

[9] Given the nonexistence of evidence, we understand why the appellate court in *Bauman* refused to simply "assume . . . that other tenants paid similar cleaning fees and moved out with refunds owing to them . . . ." (*Bauman*, *supra*, 45 Cal.App.3d at p. 802.)

21.

## **DISPOSITION**

The order denying class certification is reversed and the matter is remanded with directions to grant the motion for class certification.  Costs on appeal are awarded to plaintiffs Terese and Nicholas Cardamon.

DETJEN, Acting P.J.

WE CONCUR:


PEÑA, J.


SMITH, J.

22.